# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUBEN HERRERA,<br><br>   Plaintiff,<br><br> v.<br><br>JACOB REDDING,<br><br>   Defendant. | Case No.: 1:14-cv-00164-LJO-BAM (PC)<br><br>FINDINGS AND RECOMMENDATIONS REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT<br><br>(Doc. No. 47, 55) |

## I. Introduction

Plaintiff Ruben Herrera ("Plaintiff") is a civil detainee proceeding *pro se* and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983. This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302. This action is proceeding against Defendant Jacob Redding for excessive force in violation of the Fourteenth Amendment. Currently before the Court are the parties' cross-motions for summary judgment.[1]

On August 15, 2017, Defendant filed an answer to the complaint. On September 21, 2017, the Court issued the discovery and scheduling order.

---

[1] Concurrent with defendant's motion, Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment. (Doc. 47); see Woods v. Carey, 684 F.3d 934 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1988); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

On August 9, 2018, Defendant filed a motion for summary judgment. Plaintiff filed an objection/opposition to Defendant's motion on October 4, 2018 and a purported cross-motion for summary judgment. (Doc. 55.) Defendant filed a reply on October 18, 2018. On December 21, 2018, Plaintiff filed an answer to Defendant's reply. (Doc. 63.) For the reasons set forth below, the Court recommends that Plaintiff's motion for summary judgment be denied, and Defendant Redding's motion for summary judgment be granted.

## II. Plaintiff's Surreply

On December 21, 2019, Plaintiff filed an "answer to defendants reply to the opposition," which the Court construes as a surreply. Parties do not have the right to file surreplies and motions are deemed submitted when the time to reply has expired. Local Rule 230(l). The Court generally views motions for leave to file a surreply with disfavor. Hill v. England, No. CVF05869 REC TAG, 2005 WL 3031136, at *1 (E.D. Cal. 2005) (citing Fedrick v. Mercedes–Benz USA, LLC, 366 F.Supp.2d 1190, 1197 (N.D. Ga. 2005)). However, district courts have the discretion to either permit or preclude a surreply. See U.S. ex rel. Meyer v. Horizon Health Corp., 565 F.3d 1195, 1203 (9th Cir. 2009) (district court did not abuse discretion in refusing to permit "inequitable surreply"); JG v. Douglas County School Dist., 552 F.3d 786, 803 n.14 (9th Cir. 2008) (district court did not abuse discretion in denying leave to file surreply where it did not consider new evidence in reply); Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996) (new evidence in reply may not be considered without giving the non-movant an opportunity to respond). Although Plaintiff does not have a right to file a surreply, in this instance, the Court will exercise its discretion and consider the surreply in ruling on Defendant's and Plaintiff's cross motions for summary judgment.

## III. Summary Judgment Legal Standard

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the case under the applicable law. See Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Id.

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. See Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). If the movant will have the burden of proof at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." Id. (citing Celotex, 477 U.S. at 323). In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." Id.

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in [its] favor." F.T.C. v. Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis omitted). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. Id. at 929; see also Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56[], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." Soremekun, 509 F.3d at 984. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn

in [its] favor." Anderson, 477 U.S. at 255. Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

In arriving at these findings and recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. The Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

## IV. Discussion

### A. Undisputed Material Facts ("UMF")[2]

The facts surrounding the event of September 18, 2011 are largely undisputed. For the purposes of the parties' cross-motions for summary judgment currently before the Court, the relevant undisputed material facts are as follows:

1. Since 2009, Plaintiff Ruben Herrera has been confined at Coalinga State Hospital ("CSH") as a civil detainee under California's Sexually Violent Predator Act. (Third Am. Compl. ¶ 2, Doc. 30; Herrera Dep. 7:15-16, Doc. 47-4.)

2. At the time of the incident, Defendant Jacob Redding was a Police Officer with the Department of Police Services ("DPS") at CSH. Redding had Special Weapons And Tactics

---

[2] These facts are taken from a combination of Defendant's Statement of Undisputed Material Facts (Doc. 47-2) and Plaintiff's facts, as explained in this footnote. Plaintiff failed to comply with Local Rule 260, which requires Plaintiff to admit Defendant's facts that are undisputed and deny those facts that are disputed, with citation to admissible evidence to support the disputed fact. In Plaintiff's Response (Doc. 57) to Defendant's Statement of Undisputed Material Facts, Plaintiff did not do so, but rather responded "Plaintiff agrees and disagrees," to each of Defendant's Undisputed Facts. Plaintiff did not specify what portion of the fact he agreed to and which portion he disagreed with and the basis for the disagreement. Thus, Plaintiff has not identified "disputed facts" as required by Local Rule 260(b). Accordingly, as the Court cannot rely on Plaintiff's Response to Defendant's Statement of Undisputed Material Facts to identify disputed facts, the Court has culled Plaintiff's purported disputed facts from Plaintiff's Opposition/Cross-Motion and Surreply and in light of Defendant's Statement of Undisputed Material Facts. (See Doc. 47-2, 55, 63.) The Court has construed these facts in a light most favorable to Plaintiff.

4

1. (SWAT) training and was also trained on the 40 mm exact impact foam round launcher. (Redding Decl ¶¶ 1, 3, Doc. 47-3; Herrera Dep. 13:5-12, Doc. 47-4.)

3. On September 18, 2011, Plaintiff climbed to the top of the basketball backstop in the Unit 9 sports yard, and remained there for about four hours. (Herrera Dep. 13:18-23, Doc. 47-4; Third Am. Compl. ¶¶ 4, 7, Doc. 30; Redding Decl. ¶ 5, Doc. 47-3.)

4. Over the course of the time that Plaintiff was atop the basketball backstop, clinical and DPS staff repeatedly asked Herrera to come down. (Third Am. Compl. ¶¶ 4, 6-8, Doc. 30; Redding Decl. ¶¶ 5, 7-8, Doc. 47-3.)

5. Plaintiff refused to comply with staff's requests for Plaintiff to come down off the basketball backstop. (Id.)

6. Defendant Redding was assigned to deploy a 40mm exact impact foam round in the event Plaintiff continued to refuse to comply with orders to come down from the basketball backstop. (Redding Decl. ¶¶ 6-7, Doc. 47-3.)

7. At the time of this incident, Plaintiff was on one-to-one observation status for being a potential danger to himself. Defendant Redding heard someone say that Plaintiff was on "one-to-one," and Redding understood being on one-to-one observation meant that clinical staff was supervising Herrera for possible danger of self-harm. (Camera 2 Video at 05:55-06:05; Redding Decl. ¶8, Doc. 47-3.)

8. Plaintiff, atop the basketball backstop, was about 13-feet off the ground. (Plaintiff's Opposition, p. 7 of 54, Doc. 55.)

9. Staff covered the ground around the basketball hoop with approximately seven foam bed mattresses, two mattresses high in certain locations. (Redding Decl. ¶ 10, Doc. 47-3; Third Am. Compl. ¶ 6, Doc. 30.)

10. Staff Psychiatrist Tirath Gill and the Emergency Response Team (ERT) Sergeant tried to talk Plaintiff down. Plaintiff refused to come down. (Redding Decl. ¶ 10, Doc. 47-3; Third Am. Compl. ¶ 6; Third Am. Compl. ¶¶ 6-7, Doc. 30.)

11. Plaintiff was warned before he was shot that he would be shot if he did not voluntarily come down off the basketball backstop. (Herrera Dep. p. 23-24, Doc. 47-4; Third Am. Compl. ¶7, Doc. 30.)

12. Plaintiff understood he was going to be shot with something like a beanbag and not a bullet. (Herrera Dep. p. 24, Doc. 47-4.)

13. When Dr. Gill's and the Sergeant's continued repeated requests for Plaintiff to come down were unsuccessful, Defendant Redding gave Plaintiff three orders to get down. (Redding Decl. ¶¶ 11-12, Doc. 47-3; Camera 2 Video at 11:15-11:26; Herrera Dep. 23:35-24:13, Doc. 47-4.)

14. Plaintiff refused to come down and said, "go ahead and shoot me." (Herrera Dep. 23:35-24:13, Doc. 47-4.)

15. Redding aimed the 40mm launcher at Herrera's mid-section of his torso and fired a single round, striking Herrera in the upper left side of his chest (on his left pectoral muscle). (Redding Decl. ¶ 13, Doc. 47-3; Opposition p. 8-9, Doc. 55; Herrera Dep.33, Doc. 47-4.)

16. Plaintiff turned to his left, hunched over, bent his knees, appeared to jump down onto the mattresses, landed on his feet, and then fell forward face down. (Redding Dec. ¶14, Doc. 47-3; Video Camera 2 at 11:26.)

17. Defendant Redding did not aim for or shoot Plaintiff in the heart with the 40 mm foam round. Defendant Redding aimed for Plaintiff's mid-section, above his navel. Due to the upward trajectory and Plaintiff's movement, the round struck Plaintiff on the left side of his upper chest—above and just to the right of his left nipple. (Redding Decl. ¶ 18, Doc. 47-3; Video at 18:35; Herrera Dep. 40:22-24.)

18. Plaintiff testified at his deposition that he does not know what happened after he was hit with the 40 mm projectile or what part of his body impacted the mattress first. He stated that he is "going with" what the video shows occurred after he was shot. (Herrera Dep. 28:10-24, 30:3-6, 39:2-8, Doc. 47-4.)

///

///

**B. The Parties' Arguments**

Defendant moves for summary judgment on the grounds that: (1) Defendant Redding did not use excessive force in violation of Plaintiff's Fourteenth Amendment rights; (2) Defendant Redding is entitled to qualified immunity; and (3) there are no disputed material facts to be adjudicated. Defendant Redding's use of force was necessary and reasonable. Plaintiff's intentions were unknown to Defendant Redding, and Plaintiff posed a danger to himself given his elevated location on back of the basketball backstop. Defendant Redding had no other reasonable use-of-force option available to him to safely gain Herrera's compliance with his lawful orders to get down from the basketball pole.

Plaintiff makes three general arguments why the force used was excessive:

1. Plaintiff was never a threat to staff or officers or to himself, as he did not threaten to harm himself.
2. There was a reasonable alternative to the use of force, which was to "wait Plaintiff out."[3]
3. The force used was excessive because the shot landed near his heart which could have been fatal.

**C. Video of the Incident**

Defendants lodged a CD containing one audio and two videos of the incident in support of the Motion. (Doc. 48.) The existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor. Blankenhorn v. City of Orange, 485 F.3d 463, 468 n. 1 (9th Cir. 2007). However, if the video "blatantly contradict[s]" a party's account, "so that no reasonable jury could believe it," the court need not credit the contradicted version on summary judgment. Scott v. Harris, 550 U.S. 372, 380 (2007); Williams v. Las Vegas Metro. Police Dep't, No. 2:13-CV-

---

[3] Plaintiff also argues that Defendant was negligent in his actions and violated other state laws or internal policies. (Doc. 55 p 17-22.) Plaintiff also argues that Defendant Redding's conduct was in violation his First Amendment right to protest. (Doc. 55 p. 22-24.) However, this case proceeds solely on a claim of excessive force in violation of the Fourteenth Amendment and not on any other Constitutional violation or any state law based claim. Accordingly, the Court declines to address Plaintiff's arguments and confines its analysis to the excessive force claim.

1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) (The existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor.); see Vos v. City of Newport Beach, 892 F.3d 1024, 1028 (9th Cir. 2018) ("The record is viewed in the light most favorable to the nonmovants ... so long as their version of the facts is not blatantly contradicted by the video evidence."). The Court will consider the video, but will consider the facts in the light most favorable to Plaintiff.

**D. Fourteenth Amendment – Excessive Force**

The Due Process Clause of the Fourteenth Amendment protects civil detainees from the use of excessive force which amounts to punishment, Gibson v. County of Washoe, Nev., 290 F.3d 1175, 1197 (9th Cir. 2002) (citing Graham v. Connor, 490 U.S. 386, 395 n.10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). An excessive force claim brought by a person, confined in a state institution, who is not a "prisoner" subject to punishment, should be evaluated under the objective reasonableness standard of the Fourteenth Amendment as applied to excessive-force claims brought by pretrial detainees, and not under the Eighth Amendment excessive-force standard. Andrews v. Neer, 253 F.3d 1052, 1061 (9th Cir.2001). This due process standard recognizes that the state is entitled to hold such a person in custody and that the detainee's confinement raises "concerns similar to those raised by the housing of pretrial detainees, such as the legitimate institutional interest in the safety and security of guards and other individuals in the facility, order within the facility, and the efficiency of the facility's operations." Andrews, 253 F.3d at 1061 (citing Johnson–El v. Schoemehl, 878 F.2d 1043, 1048 (8th Cir.1989)). The inquiry is whether Defendants' actions were objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. Lolli v. County of Orange, 351 F.3d 410, 415 (9th Cir. 2003) (citing Graham, 490 U.S. at 397) (quotation marks omitted).

The parties agree that the analysis of Plaintiff's claim of excessive force turns on the reasonableness of the officers' actions under the circumstances, citing White v. Roper, 901 F.2d 1501, 1507 (9th Cir.1990) (substantive due process claim by pretrial detainee requires courts to

8

balance several factors focusing on the reasonableness of the officers' actions under the circumstances). (See Doc. 47-1 and Doc. 55) The factors which must be weighed in making this determination include: (1) the need for the application of force, (2) the relationship between the need and the amount of force that was used, (3) the extent of the injury inflicted, and (4) whether force was applied in a good faith effort to maintain and restore discipline. [4] White, 901 F.3d at 1507.

### 1. The Need for Force: Plaintiff was Perceived as a Threat to Himself

It is undisputed that Defendant Redding fired a single round of a 40mm exact impact foam round which hit Plaintiff in the left chest area. Plaintiff argues that he was never a threat to officers or staff such that this force was needed. He argues he was standing atop a basketball backstop and was not in a position to harm anyone. He argues he was engaged in a peaceful protest of his housing assignment. He was not suicidal and was not acting suicidal. Plaintiff argues that "one disruptive individual perched atop a 13' basketball pole cannot be considered a major disturbance." (Surreply p. 6, Doc. 63.)

It was undisputed that Plaintiff was a perceived threat to himself, by the staff and by Defendant Redding. The undisputed evidence shows that Defendant Redding knew Plaintiff was one-on-one status, which Defendant Redding knew meant Plaintiff was a danger of self-harm. Plaintiff had already been atop the basketball backstop, 13-feet above the ground, for some four hours, unwilling to comply with orders by others to come down.[5] Plaintiff was making irrational demands. (Video Camera 2 at 0:05, (Plaintiff's demands "steak, rice pilaf, cheesecake, a helicopter, and $10 million, or I ain't coming down.")[6] He refused all commands. (Opposition,

---

[4] These factors are largely the same as stated in more recent case authority. Factors which may bear on the reasonableness or unreasonableness of the force used include: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. Kinglsey v. Hendrickson, - U.S. -, 135 S.Ct. 2466, 2473 (2015) (citing e.g., Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865 (1989)).

[5] Plaintiff agrees that he was asked somewhere around 20 times to come down. (Herrera Dep. p. 23: 2-8, Doc. 47-4.)

[6] Plaintiff now refers to these demands as "annoyingly comical," but it is undisputed that he made such demands, and he did not inform the observers that his demands were "joke." There is no evidence that anyone who heard his demands perceived them as "comical." (Opposition, Doc. 55, p.8.)

9

Doc. 55 p.5 ("[plaintiff] held fast against all direct commands.")) Plaintiff admits that he did not and would not comply with orders even when faced with being shot. Plaintiff states that, "Even at the point when Redding aimed the 40 mm launcher at Herrera, and Herrera continued to hold fast, it was only because he actually believed that Redding would not shoot him." (Opposition, Doc. 55, p. 8.) The entirety of Plaintiff's conduct while atop the basketball backstop, demonstrates that Plaintiff was actively resisting, acting irrational, and was a perceived threat to himself.

Indeed, Plaintiff admits that force was needed. "Although Plaintiff's passive resistance created a need for Redding to apply (supposedly) reasonable force to gain compliance from Herrera, the method Redding exerted to make the arrest was with out probable cause." (Opposition, Doc. 55 p. 25.) The Court takes this statement to mean that Plaintiff agrees his "passive resistance" created a need to apply reasonable force. But Plaintiff argues the 40 mm launcher force was unnecessary.

Plaintiff does not dispute that Defendant Redding believed Plaintiff was on one-on-one status for being a potential danger to himself. (Opposition Brief (Doc. 55).) Rather in his Surreply, Plaintiff argues that he was on one-on-one status, not for suicidal ideation, but for "disruptive behavior," because of his prior protest in March 2011. (Doc. 63, Surreply p. 9.) Plaintiff says he was not suicidal or intended any self-harm.

Even accepting as true, as Plaintiff argues, that Plaintiff was not suicidal or intended self-harm when he was atop the basketball backstop, this fact does not raise a material disputed fact. There is no evidence that Defendant Redding was aware that Plaintiff was not suicidal or intended self-harm. It is undisputed that Defendant Redding understood that Plaintiff was one-to-on status, which Redding understood to mean that clinical staff was supervising Plaintiff for possible danger of self-harm. (Redding Decl ¶8, Doc. 47-3 ("I understood this comment to mean that clinical staff was supervising Herrera for possible danger of self harm.").) Plaintiff was defying staff, acting irrational and was making irrational demands. Thus, as far as Defendant Redding knew, Plaintiff was a danger to himself while atop the basketball backstop. Moreover, while Plaintiff argues that he was not "suicidal," the risk still existed of self-harm while Plaintiff

10

was atop a 13' basketball backstop from an inadvertent, or intentional, fall. Plaintiff was at risk while he remained so far above the ground. Thus, it was objectively reasonable that some form of force was required to get Plaintiff off of the basketball backstop.

### 2. The Relationship between the Need and the Amount of Force: "Wait Plaintiff Out"

Plaintiff argues the only acceptable force was to "wait Plaintiff out." Plaintiff argues that the force used was excessive because there was a simple alternative of simply waiting Plaintiff out. Plaintiff argues he engaged in a similar "protest" months earlier in March 2011 when he climbed atop a Post Office yellow canopy. (Opposition, Doc. 55 p. 10.) That protest ended peacefully, and he came down after an 8-hour standoff. Plaintiff uses this prior protest as the example Defendant Redding should have followed and simply "waited Plaintiff out."

However, there is no evidence that in the prior protest, Plaintiff was on one-on-one status, where he was a danger of doing harm to himself. In this current episode, Defendant Redding was aware the Plaintiff was on one-on-one status, as a danger of harming himself. No person, except Plaintiff, knew Plaintiff's intentions while atop the basketball backstop.

Defendant Redding presents evidence that other forms of potential force were considered and ruled out. Plaintiff does not dispute that these other forms of force were options available to Defendant Redding, but merely argues Defendant should have waited plaintiff out. The other use-of-force options available to Defendant Redding in 2011, but ruled out, were physical force, pepper spray (MK-4), and the expandable baton. (Doc. 47-2, UMF Fact 3.) Physical force was not a reasonable option for Redding because of Herrera's location on top of the basketball pole, which would require a ladder to reach Herrera. (Doc. 47-2, UMF Fact 28.) The baton was not a reasonable option because of Herrera's location on the top of the basketball backstop pole, which could not be reached without the use of a ladder. (Doc. 47-2, UMF Fact 26). Pepper spray was not a reasonable option for Redding because it would have created a slipping condition or incapacitated Herrera, creating a risk of Herrera falling uncontrollably. (Doc. 47-2, UMF Fact 30.) Plaintiff does not dispute that Defendant Redding considered these options for force and ruled them out.

A Plaintiff is not entitled to disregard orders without consequences. Courts accord wide-ranging deference to prison administrators in the exercise of policies and practices that in their judgment are needed to preserve internal security, safety and discipline. Whitley v. Albers, 475 U.S. 312, 319, 322-23, 106 S.Ct 1078 (1986). The Supreme Court stated in Whitley that at least in the prison security context, the "Due Process Clause affords no greater protection than does the Cruel and Unusual Punishment Clause." Id. at 325, 106 S.Ct at 1088; see Kingsley v. Hendrickson, 135 S. Ct. 2466, 2474, 192 L. Ed. 2d 416 (2015) (a court must take account of the legitimate interests in managing an institution, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate.); see also Uerling v. Piccinini, 238 F.3d 433 (9th Cir. 2000) (Because Uerling admitted that he refused to comply with orders to be handcuffed and removed from his cell, and physically resisted correctional officers attempting to remove him from his cell, the force used to extract and restrain him was not unreasonable). Plaintiff's "actions created a need for [Defendant] to apply reasonable force to control [Plaintiff]." White v. Roper, 901 F.2d 1501, 1507 (9th Cir. 1990); see also Turner v. Graff, 2012 WL 3656492, *4 (N.D. Cal. 2012) ("Even if plaintiff's resistance did not pose a physical threat to the officers, it created a need for them to apply reasonable force to control plaintiff in order to maintain discipline and order."); Manriquez v. Huchins, 2011 WL 6293962, *3 (E.D. Cal. 2011) ("An inmate's failure to comply with prison officials would create a need for the use of force to gain compliance and restore order."), report and recommendation adopted by, 2012 WL 94475 (E.D. Cal. 2012); Stevenson v. Harmon, 2009 WL 667198, *15 n.9 (S.D. Cal. 2009), affirmed by, 406 F. App'x 97 (9th Cir. 2010) ("When an inmate refuses to comply with the order of a staff member, a threat may be reasonably perceived by staff.").

Here, Plaintiff's actions created the need for force. Plaintiff refused to comply with orders, both verbally and physically. He made irrational demands. He was perceived as a danger to himself. Plaintiff had been ordered to come down from the basketball backstop, refused for four hours, and was warned he would be shot if he did not come down. Plaintiff's refusal to comply with orders created the need for force to gain compliance, restore discipline and ensure

12

Plaintiff's safety. There is evidence no other form of force was reasonable in this situation. Under circumstances involved, Defendant Redding was not required to wait Plaintiff out as the acceptable means to maintain discipline and restore order.

### 3. The Extent of the Injury Inflicted and Effort Redding made to Temper Force

It is undisputed that Plaintiff did not suffer extensive injuries. Plaintiff was hit above the heart with the foam round, and the impact was painful, but only left a small permanent scar, which is not painful. (Herrera Dep., Doc. 47-4, p. 36.) "Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts." Wilkins v. Gaddy, 559 U.S. 34, 38, 130 S. Ct. 1175, 1178, 175 L. Ed. 2d 995 (2010). "The extent of injury may ... provide some indication of the amount of force applied.... [N]ot 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" Wilkins v. Gaddy, 559 U.S. at 37 (quoting Hudson, 503 U.S. at 9). This injury must be evaluated in the context in which the force was deployed.

As explained above, Defendant Redding was faced with a detainee who was defiant of repeated orders over a protracted amount of time, who was making irrational statements, with unknown intentions and under a one-on-one status observation for being a danger to himself. Redding had considered and ruled out other forms of force. Plaintiff was warned he would be shot with a foam type projectile and not a bullet.

It is undisputed that the location of the strike, near Plaintiff's heart, was not the intended target. Defendant Redding aimed the 40 mm launcher at Plaintiff's midsection of his torso, and there is no evidence that Defendant meant to shoot Plaintiff near his heart. Defendant Redding had already ruled out shooting at Plaintiff's legs because sweeping Plaintiff's legs out from under Plaintiff, 13' above the ground, would have been more dangerous. (Redding Decl. ¶23, Doc. 47-3.) Plaintiff admits that Redding attempted to shoot the 40 mm launcher at Plaintiff's midsection and upper torso: "Having already pointed the launcher at Herrera's midsection and at his upper torso, he pulled the trigger and fired a single round; however, . . . the impact struck Herrera in the upper left part of his chest, an area located near his heart." (Doc. 55 Opposition p.

8-9; Herrera Depo, Doc. 47-4, p.33,.) Redding acted in accordance with policy in aiming the 40 mm launcher at Plaintiff's midsection. (Doc. 47-2 UMF, Fact no. 22 (CSH policy related to the use of the 40 mm launcher provided that it was acceptable to target the abdomen or upper torso if necessary to gain compliance.)) The video shows that after being shot, Plaintiff had some measure of control of himself, was able to jump onto the mattresses below and did not fall uncontrollably down off the basketball hoop. (Redding Decl. ¶ 14, Doc. 47-3; Camera 2 Video at 11:27-11:32.) Thus, there is no evidence that the 40 mm launcher was used to strike Plaintiff's heart or that it projected such force that Plaintiff was unable to retain control of himself to get down. Plaintiff suffered pain and has a small scar from the use of force, which in light of context, is a de minimis injury.

Yet, Plaintiff's main argument is not the injury he in fact suffered, but rather, the injury he could have suffered. Plaintiff complains of the injury he could have received from "the impact of the round's velocity [which] could have created a lethal cardiac arrest which could have had deadly or crimpling aftereffects." (Opposition, Doc. 55 p. 9, 14.) Plaintiff argues that his injuries "could have been far worst considering the approximation of where the shot was taken." (Opposition, Doc. 55 p. 24.) Because the 40 mm shot ultimately struck Plaintiff near his heart, Plaintiff argues he could have gone into cardiac arrest or worse.

Here, Plaintiff challenges that the force was excessive because of what <u>could have happened</u>. Hypothetical harm, however, is not protected harm. Excessive force is measured by the actual harm plaintiff suffered, not the hypothetical harm which could have happened. Section 1983 creates "'a species of tort liability' in favor of persons who are deprived of 'rights, privileges, or immunities secured' to them by the Constitution" and compensation is designed *for the injury caused by the violation*." <u>Memphis Community School Dist. v. Stachura</u>, 477 U.S. 299, 309, 106 S. Ct. 2537, 2544, 91 L. Ed. 2d 249, 32 Ed. Law Rep. 1185 (1986) (emphasis added). There are no damages for "the abstract value of the constitutional deprivation." <u>Memphis Community School Dist.</u>, 477 U.S. at 309, 106 S. Ct. at 2544 (whatever the constitutional basis for § 1983 liability, such damages must always be designed "to compensate injuries caused by the [constitutional] deprivation.") While a plaintiff may recover for mental

14

and emotional distress caused by a violation of her rights, Carey v. Piphus, 435 U.S. 247, 264 (1978); Bloom v. City of Scottsdale, 977 F.2d 587, 1992 WL 258883 (9th Cir. 1992) (unpublished decision), Plaintiff does not offer evidence that Plaintiff suffered any mental or emotional distress caused by the 40 mm shot. Rather, the opposition and surreply seem to make clear, that now months and years after reflecting upon what could have happened, he claims excessive force for an injury which did not occur. (See Doc. 47-2, UMF Fact # 18 (Herrera testified at his deposition that he does not know what happened after he was hit with the 40 mm projectile or what part of his body impacted the mattress first. He stated that he is "going with" what the video shows occurred after he was shot. (Herrera Dep. 28:10-24, 30:3-6, 39:2-8.).)

Plaintiff has failed to raise a material issue that both the force used was more than reasonably necessary and some actual injury that is not de minimis.

### 4. Good Faith Application of Force

Plaintiff argues Defendant Redding's act was not in good faith. Plaintiff argues that Plaintiff taunted Redding while Plaintiff was atop the basketball backstop which "forced Redding to act despite Herrera's non-violent protest." (Doc. 55, Opposition p.13, 16.) Plaintiff also argues that Defendant Redding applied the force to chill Plaintiff's first amendment rights to protest and that Defendant's "motivation" was to send "a message to other patients – you cross the line and there will be consequences." (Doc. 55, Opposition p. 15.)

Despite Plaintiff's speculation as to Defendant Redding's motives, the only evidence before the Court is that Defendant Redding shot the 40 mm launcher in order to gain compliance with lawful orders, restore discipline, and protect a detainee who was a perceived danger to himself. As explained above, it is undisputed Plaintiff was atop a 13-foot high basketball backstop, making irrational statements, acting irrational, defying orders, and was perceived as a danger to himself. Redding considered and ruled out a number of other forms of force. Redding considered and ruled out striking at Plaintiff's legs, to avoid sweeping out Plaintiff's feet from under him. Redding gave three warnings to Plaintiff that Plaintiff would be shot if Plaintiff did not come down, and Plaintiff understood that he would be shot with the 40 mm launcher if he did not come down. When Defendant Redding aimed the 40 mm launcher, it is undisputed that 40

15

mm shot was aimed at his torso, but inadvertently hit Plaintiff above his heart as Plaintiff turned his body. It is undisputed that defendant Redding did not shoot directly at Plaintiff's heart.

Plaintiff's argument that Defendant Redding was motivated to suppress Plaintiff's first amendment rights to protest is irrelevant to the claim presented to this Court. No First Amendment claim is cognizable in this case. The only claim, excessive force, is determined objectively from the totality of the circumstances. A claim of excessive force by a detainee is analyzed under the objective reasonableness standard. See Gibson, 290 F.3d at 1197 (citing Graham v. Connor, 490 U.S. at 397) (holding use of force is reasonable after careful balancing of the nature and quality of the intrusion on the individual's constitutional interests against the countervailing government interests at stake).

Having carefully reviewed the evidence, the Court concludes that no reasonable jury could find that Defendant Redding acted in an objectively unreasonable manner in the application of the force used. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted). See Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994) ("[D]efendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances."). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court will recommend summary judgment in favor of Defendant Redding and will recommend denial of Plaintiff's motion.

**D. Qualified Immunity**

Defendant also asserts that the Court should grant summary judgment on the basis of qualified immunity. However, the Court finds that this argument need not be reached, based upon the above determination regarding the undisputed facts in this case.

///

**V. Conclusion**

For the reasons explained above, the Court HEREBY RECOMMENDS that:

1. Plaintiff's cross-motion for Summary Judgment (Doc. 55), be DENIED; and
2. Defendant Redding's motion for Summary Judgment (Doc. 47) be GRANTED.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, under 28 U.S.C. § 636(b)(l). Within **fourteen (14) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of the "right to challenge the magistrate's factual findings" on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **February 20, 2019**            /s/ *Barbara A. McAuliffe*
                                        UNITED STATES MAGISTRATE JUDGE